IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GRAHAM A. HARRISON                    :
                                      :
            V.                        :        C.A. NO.  06-1380
                                      :
THE PRUDENTIAL INSURANCE              :
COMPANY OF AMERICA                    :

MEMORANDUM OPINION AND ORDER

GOLDEN, J.                                         FEBRUARY 15, 2008

Plaintiff brought this action under section 502(a)(1)(b) of the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B)[1], seeking to overturn the

decision of Defendant Prudential Insurance Company of America, ("Prudential") that he is no

longer eligible for partial long-term disability benefits under the terms of the Long Term

Disability Plan (the "Plan") provided by his employer, Milliman, Inc. ("Milliman"). Presently

before the Court are the parties' cross-motions for summary judgment. For the reasons that

follow, the motion of the Plaintiff is granted and the motion of the Defendant is denied.

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

---

[1] Section 502 provides that:

A civil action may be brought-

(1) by a participant or beneficiary-

(B) to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322-32 (1986). In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the non-moving party. Matsushita Elec.Indus.Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 , 587 (1986).

Because the Court is confronted with cross-motions for summary judgment, the Court must consider each party's motion individually, and both parties bear the burden of establishing a lack of genuine issues of material fact. Reinert v. Giorgio Foods, Inc., 15 F.Supp. 2d 589, 593-94 (E.D.Pa. 1998).

The following material facts are taken from the administrative record and are not in dispute:

At the time he brought this action, Plaintiff was a 54 year old male who was first diagnosed with Tourette's Syndrome ("TS") in his 30's. Admin.Rec. at 000389.

Plaintiff began his employment with Milliman in 1984. Admin.Rec. at 000326. On Ocotber 22, 2001, Plaintiff began working part-time citing "persistent headaches due to chronic Tourette Syndrome" which "[a]dversely affect[ed] [his] ability to concentrate for sustained time periods without incurring significant head pressure and pain which [was] increased by work stress." Admin.Rec. at 000325.  In 2001, Plaintiff worked for Milliman as a consulting actuary. Admin.Rec. at 000324. As a consulting actuary, Plaintiff was classified as a "Principal" by his employer. Admin. Rec. at 000327. The Rider to the Plan that applies to "Officers, Principals and Consultants" states that an employee is disabled when Prudential determines that:

-you are unable to perform the **material and substantial duties** of your **own occupation** due to your **sickness** or **injury**; and

-you have a 20% or more loss in your **Indexed monthly earnings** due to that **sickness** or **injury**.

The Rider further provides:

**Own occupation** means the occupation you are routinely performing for a specific employer or at a specific location when your disability occurs. Guidelines will be taken into account from your Employer's job description.

Admin.Rec. at 000040.

The earliest medical record is a letter dated June 1, 1993 from a Robert Slater, M.D. to Plaintiff's treating physician in which Dr. Slater noted that he has seen Plaintiff in the past for both TS and for a mixed headache disorder with tension and migraine features. Admin.Rec. at 0000383. Dr. Slater states that Plaintiff was being treated with 25 mg of Elavil per day. Id. There is no further medical evidence in the record concerning Plaintiff's TS or headaches until November of 2000.

In a letter to Plaintiff's treating physician dated November 10, 2000 from Michael N. Rubenstein, M.D., Dr. Rubenstein, a neurologist, confirms that Plaintiff suffers from TS and chronic headaches with significant obsessive-compulsive disorder and anxiety. Admin. Rec. 000352-54. He prescribed Zoloft. Id.

In a letter to Plaintiff's treating physician dated October 17, 2001, Dr. Rubenstein states, inter alia:

He continues to have multiple motor tics and has noted his productivity has declined at work. In addition to his chronic anxiety, he also has agitation and notes that his sleeping has suffered, such that he rarely is able to sleep through the night and has a difficult time getting through the day because of this. He also related today that the recent events of September 11 have increased his overall

3

symptomatology, particularly in regards to anxiety and agitation... He appears to have decompensated over the time since last seeing me in February and despite his continued follow-up by Dr. Meyer, has had difficulty with his full-time work schedule. As such, I have recommended to Mr. Harrison that he consider reducing his work schedule to less than full-time to accommodate his present difficulties which are the result of his Tourette Syndrome.

Admin.Rec. at 000348-49.

Plaintiff applied for and received short-term disability benefits from January 2002 to April 2003. On April 10, 2003, Plaintiff filed a claim for partial long-term benefits from Prudential under the terms of the Plan. Admin.Rec. at 000323-331.

Plaintiff was also evaluated by Peter J. Meyer, M.D., who is board certified in psychiatry and neurology and who has served as director of two Tourette Syndrome Programs in Pennsylvania. Admin.Rec. at 000282-283.

In a handwritten letter to Prudential dated July 5, 2003, Dr. Meyer stated:

Since October 2001, [Plaintiff] has worked on a 4 days a week (Monday, Tuesday, Thursday, Friday) basis. This came about at the recommendation of his neurologist Michael Rubenstein, M.D., at my suggestion and with my full support, and ongoing monitoring. This shortened workweek was indicated because Mr. Harrison's Tourette's has entailed intractable head tics and resultant severe headaches, anxiety and depression. By intractable I mean very refractory to sophisticated medication, cognitive-behavioral and biofeedback treatment attempts from managing the tics and the associated muscle spasms that cause the headaches. With the 4 day work week with the midweek break, however, Mr. Harrison has been subjectively much less symptomatic and has been able to stay at work and be quite productive...

I therefore conclude Mr. Harrison does suffer from a long term, as yet still partial, very real disability from his Tourette's Syndrome and associated disorders and complications. In as much as he has not improved in the last year and a half it is no longer likely to improve and must be considered permanent...I still consider it medically essential in view of the foregoing that he work only four days/week, in the manner described...A five day work week would very likely cause not merely discomfort, but (as it did before the short term disability status started) a very high likelihood of increasing severe disability which would further aggravate the

4

present problems and worsen the degree of disability.

Admin.Rec. at 000316-319.

By letter dated July 28, 2003, Prudential denied Plaintiff's request for benefits.

Admin.Rec. 000312-313. Prudential first stated: "You worked as a Principal for Milliman USA.

The material and substantial duties of your occupation are considered sedentary in nature." Id. at

312.  Prudential then summarized its reasons for denying partial long-term benefits as follows:

> The medical documentation in file was reviewed with our Medical Director. The medical records indicate that you have had Tourette's Syndrome with headache features dating back to your early 30's. The records do not document a significant change in your medical condition that would precipitate total or partial disability. The medical records indicate that you have worked effectively with your condition and do not document any significant change which would warrant a partial impairment. The records indicate that you are currently able to work 4 full days per week, which is suggestive that your Tourette's is very well controlled. The information in file indicates that Dr. Meyer began treating you for Tourette's right around the time you changed your work schedule. Therefore, he cannot comment on what has changed in your condition which would require a schedule change...

Admin. Rec. at 000312.

Prudential's "Medical Director" is  Jill C. Fallon, M.D., MPH Admin.Rec. at

000290. Dr. Fallon is board certified in occupational medicine. Id. There is no evidence that Dr.

Fallon  has any expertise in neurology or TS. Dr. Fallon did not examine Plaintiff. Although Dr.

Fallon did not prepare a written report, she apparently opined to a Prudential claims

representative that Plaintiff's medical records only supported a one month period of

destabilization in October, 2001, and that once Plaintiff's medication was adjusted, he "should

have stabilized." Admin.Rec. at 000394.

In the denial letter, Prudential incorrectly cited the definition of disability by

referring to provisions applicable to employees of Milliman who were not "Officers, Principal

5

and Consultants." Admin.Rec. at 000311.

By letter dated January 21, 2004, Plaintiff appealed Prudential's decision to deny benefits. Admin.Rec. at 000270-288. In support of his appeal, Plaintiff wrote a letter explaining that his TS symptoms increased due to "dramatic" changes in his job in 1999 and 2000. Id. at 000284. He wrote that he experimented with prescription drugs, one of which (Geodon) caused him adverse side effects in October, 2001. Id. In addition to drugs, Plaintiff and his doctors decided that cutting back on his work schedule from five to four days would relieve his symptoms. Id. at 000285.

As part of his appeal, Plaintiff attached a statement from his wife concerning the worsening of Plaintiff's condition around June, 2001 and the improvement she observed after he changed his work schedule. Admin. Rec. at 000286. Plaintiff also submitted statements from a friend and a colleague illustrating the worsening of Plaintiff's condition in 2001 and the noticeable improvements after the change in his work schedule. Admin. Rec. at 000287-288.

Plaintiff also attached a four page report from Dr. Meyer, together with a copy of Dr. Meyer's curriculum vitae. Admin.Rec. at 000276-283. Dr. Meyer wrote that Plaintiff had a "major deterioration on his overall condition in the fall of 2001, precipitated by two very difficult months of severe agitation, significantly increased motor ticcing, and significantly worsened headaches caused by akisthesia and various related side effects of newly added Geodon, which replaced an antidepressant." Admin.Rec. at 000276. Dr. Meyer noted that Plaintiff "would deteriorate further without midweek respite." Id. at 000277. Dr. Meyer explained that Prudential's  conclusion that the ability to work four days per week suggests that Plaintiff could work five days per week was the result of "totally circular reasoning which ignores the obvious,"

stating:

> [Plaintiff] has been able to work 4 full days per week <u>precisely</u> because he only
> has to work the 4 days, in fact in 2 blocks of 2 days each sandwiched around
> Wednesdays off. Without the Wednesday off to get relief from the severe
> symptoms caused by having to strain so much to control his tics, function with
> pain and concentrate on precise and highly demanding work, [Plaintiff] could not,
> I believe, have continued to be productive at work at all.

Admin. Rec. at 000277. (emhasis in original).

Dr. Meyer also denied that he began treating Plaintiff right around the time

Plaintiff changed his work schedule, stating that he began to treat plaintiff as early as March,

2001 and continued to see him frequently thereafter, so he was able to observe "the benefits for

all aspects of his functioning." <u>Id</u>. Dr. Meyer also provided a detailed explanation of the etiology

and treatment of TS as it involved plaintiff's case and stated that his "reason for prescribing

reduced work was to prevent [Plaintiff] from having a worsening neurologic status from the

Tourette's that might preclude him from working at all." Admin.Rec. at 000278. Finally Dr.

Meyer explained why it is not his practice to give out his office notes, citing experiences where

his patients have been "victimized" by the inappropriate use of his notes. <u>Id</u>.

On appeal, Plaintiff's medical file was reviewed by Albert A. Kowalski, M.D. Dr.

Kowalski's curriculum vitae indicates that he is an employee of Prudential, has had no clinical

practice since 1987, is not certified in neurology or psychiatry, and has had no training or

expertise in the treatment of TS. Admin.Rec. at 000258.1-258.3. Dr. Kowalski did not examine

the Plaintiff. Dr. Kowalski noted in his report that Dr. Meyer's policy of not releasing his office

notes places Prudential at a disadvantage in evaluating his claim as there is no information of

exactly when plaintiff's condition deteriorated, how it deteriorated, when Geodon was

discontinued and what types of symptoms Plaintiff related to his doctor.  Admin. Rec. at 000399.

Dr. Kowalski acknowledged that the medical records "support an increase in overall

symptomatology including severe headaches, anxiety, side effects of Geodan [sic], worsening of

his obsessive-compulsive behavior, motor tics and difficulty at work." Id.  Dr. Kowalski opined

that Plaintiff's condition should have improved over time due to ongoing treatment:

> Dr. Meyers [sic] attributed improvement in his symptomatology to only working
> four days per week ignores the fact of ongoing treatment and medication
> adjustment. In addition, there didn't appear any attempt to increase the claimant's
> hours even after improvement. Therefore, in my opinion, the medical records do
> not support impairment from his Tourettes or associated conditions that would
> have prevented the claimant from performing his usual occupation five per week
> on a continuous basis......

Admin.Rec. at 000399.

      By letter dated March 1, 2004, Prudential denied Plaintiff's appeal. Admin.Rec. at

000264-67. In denying the appeal, Prudential once again quoted the wrong definitions of

disability, using the ones applicable to employees other than "Officers, Principals and

Consultants" even though it is clear from a SOAP Note of July 26, 2003, that by this time

Prudential  actually knew that the more liberal definitions in the Rider governing officers,

principals and consultants applied to Plaintiff. ("40 hour work week does not apply to this

policy..."). Admin.Rec. at 000396. In its denial letter, Prudential recognized for the first time that

Plaintiff's symptoms had worsened. Admin.Rec. at 000266.  Prudential based its denial on the

opinions of Dr. Kowalski. Specifically, Prudential stated:

> Even if this work restriction were necessary, one would expect that with therapy
> and adjustment of medications (some of Mr. Harrison's noted symptoms were
> regulated to his medication), Mr. Harrison could have been able to increase his
> hours on a graduated basis over the next 1 to 2 months...

> With therapy and treatment, there would be an expectation that he would have
> been able to return to his baseline and increase his working hours prior to the LTD
> in-benefit date of January 21, 2002....
> In addition, Mr. Harrison has the ability to work full days on Monday, Tuesday,
> Thursday and Friday of each week. From an occupational medicine perspective,
> we are unable to justify that Mr. Harrison did not have the culpability to work
> every Wednesday as well, or that working that extra day each week would have
> resulted in a deterioration of his condition.....

Admin. Rec. at 000266.

By letter dated August 11, 2004, Plaintiff again appealed. Admin.Rec. at 000235-

39. In the letter, Plaintiff's counsel states:

> ....because Prudential seems to doubt the opinions of the two Tourette's experts
> who are his treating physicians, Mr. Harrison incurred the expense of consulting
> with the individual who is considered the leading Tourette's expert in the United
> States, Oliver Sacks, M.D. A copy of Dr. Sacks' c.v. is enclosed. After examining
> Mr. Harrison, Dr. Sacks supplied Mr. Harrison with a letter that he has authorized
> be submitted in support of this disability claim, and it is enclosed.

Admin.Rec. at 000238, 240.

Oliver Sacks, M.D.  is a clinical professor of neurology at Albert Einstein College

of medicine and an adjunct professor of neurology at the NYU School of Medicine. He has

authored numerous books and articles on TS. Admin.Rec. at 000241-256. In a letter dated June 8,

2004, Dr. Sacks wrote:

> I have seen [Plaintiff] in neurological consultation. [Plaintiff] has Tourette's
> syndrome of considerable [sic] severity, with multiple tics, obsessions etc. He is
> able to function at a high and effective level only by a great effort of control and
> concentration, an effort which produces much tension, tension-headache and
> exhaustion. He can maintain this effort, and very effective functioning, for only
> two days at a time, and must then take a break, a day to recover. He cannot
> function, therefore, on a "standard" five-day week, but has to have a broken week
> (working on Monday, Tuesday, Thursday & Friday) This is a needed compromise
> with his severe Tourette's.

Admin. Rec. at 000240.

By letter dated October 15, 2004, Prudential reversed its original decision and awarded long-term benefits to Plaintiff, retroactive to January 21, 2002. Admin.Rec. at 000219-221. The letter stated, in part:

> We have reviewed the medical information provided by Mr. Harrison's treating physician and have determined that he is currently totally disabled from his regular occupation as required by the definition provided above.

Id. at 220. The definition of disability in the letter continued to be the incorrect definition applicable to employees other than "Officers, Principals and Consultants."Admin. Rec. at 000219.

By letter dated November 3, 2004, Prudential sent a revised approval letter, correcting the definition of disability to be that applicable to "Officers, Principals and Consultants." Admin.Rec. at 000216-218.

By letter dated November 10, 2004, Prudential provided a calculation of disability payments due to Plaintiff. Admin.Rec. at  000212-215. Once again, Prudential misstated policy provisions, stating that "beyond 24 months of disability payments, if your monthly disability earnings exceed 60% of your indexed monthly earnings, Prudential will stop sending you payments and your claim will end." Admin.Rec. at 000213. The 60% language does not appear anywhere in the Plan or in the Rider. Under the Plan, the only relevant measure is 80% of indexed monthly earnings. Admin.Rec. at 000041. After Plaintiff advised Prudential of this error, Prudential sent a corrected letter on November 18, 2004. Admin.Rec. at 000210-211.

On December 13, 2004, Prudential began re-evaluating Plaintiff's claim. On that day, Prudential sent Plaintiff a letter Admin.Rec. at 000202, requesting that he fill out a detailed

Activities of Daily Living Questionnaire, which Plaintiff completed and mailed back to Prudential. Admin.Rec. at 000193-200. On December 21, 2004, a claims representative for Prudential had a telephone conversation with Plaintiff.

On December 23, 2004, Prudential sent Plaintiff a letter, informing him that, based upon policy provisions which it cited in its letter that limited benefits "caused at least in part by a mental, psychoneurtoic or personality disorder" to 24 months, "[t]his initial 24 month period of disability will end as of January 20, 2005. The current medical documentation on file pertains to the above policy guidelines, therefore, your claim will most likely terminate effective January 21, 2005." Admin.Rec. at 000189-90. Plaintiff points out that there is no 24 month limitation in the Rider applicable to Officers, Principals and Consultants. Admin. Rec. at 00040-43.

Prudential also had Plaintiff's file reviewed by Stephen N. Gerson, M.D.  Dr. Gerson is board certified in psychiatry and geriatric psychiatry and lists his major professional activity as "administration."  Admin.Rec. at 000173-176.  There is no evidence in the file that Dr. Gerson has any expertise in the treatment of TS. Dr. Gerson did not examine Plaintiff. As part of his review of Plaintiff's claim, Dr. Gerson spoke to Dr. Meyer by phone for approximately one hour on January 20, 2005. Admin.Rec. at 000155. Dr. Gerson reported to Prudential on January 21, 2005, the following exchange between himself and Dr. Meyer:

> I asked Dr. Meyer if he felt the claimant could work five 8-hour workdays with breaks and accommodations and he said no, given the kind of workflow and requirement for task completion they have at the actuarial company. Dr. Meyer feels it is somewhat of a pacing problem and it is somewhat intangible and that he wouldn't be able to pick up the work on Wednesday for eight hours and complete it and somehow to the claimant this process of pacing knowing that he will have relief on Wednesday allows him to maintain an equilibrium and get his work

> done......I raised the question to Dr. Meyer if this work pattern is a preference or
> an absolute requirement for him to do his job and Dr. Meyers [sic] states that he
> can't prove it or validate it but he feels in some intangible way this is medically
> necessary for the patient to maintain his equilibrium to work his 40 to 48 hour
> workweek....

Admin.Rec. at 000156.

Dr. Gerson further reported to Prudential that "[i]t is simply the doctor's intuitive

feeling and the claimant's in terms of pacing his workweek that this is preferable in their eyes.

However, in my view, a preference doesn't equate to full impairment and disability." Admin.Rec.

at 000157. Dr. Gerson also noted that although Plaintiff's three Tourette's specialists opined that

Plaintiff needed to work reduced hours, "[n]o specific symptoms were delineated by any of the

three aforementioned physicians." Admin.Rec. at 000170.

On March 31, 2005, Prudential notified Plaintiff that it was terminating his

benefits because it had determined that full time hours at Milliman are 37.5 hours per week and

that there are no findings to support Plaintiff's inability to work a 37.5 hour week.  Admin.Rec.

at 000126-128. In the letter, Prudential quoted the relevant policy language as follows:

> You are disabled when Prudential determines that:
>
> *    you are unable to perform the material and substantial duties of your regular
> occupation due to your sickness or injury;...
>
> After 24 months of payments, you are disabled when Prudential determines that
> due to the same sickness or injury, you are unable to perform the duties of any
> gainful occupation for which you are reasonably fitted by education, training or
> experience.
>
> ...**Material and substantial duties means that:**
>
> * are normally required for the performance of your regular occupation; and

*cannot be reasonably omitted and modified, except that if you are required to work on average in excess of 40 hours per week, Prudential will consider you able to perform that requirement, if you are working or have the capacity to work 40 hours per week.

**Regular occupation** means the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.

Admin.Rec. at 000126-127.

As noted <u>supra</u>, this language did not apply to Plaintiff. When Prudential became aware of the error, Prudential sent another denial letter dated April 22, 2005, which was identical in all respects to the March 31 letter except that it deleted from the definition of disability the language relating to what happens to benefits after 24 months of payments. Admin.Rec. at 000123-125. Prudential continued, however, to reference the other misrepresentations concerning the 40 hour work week and the use of the phase "regular occupation." <u>Id</u>.

Plaintiff again appealed. On July 25, 2005 and August 25, 2005, Prudential sent letters to Plaintiff's counsel advising that it was still evaluating Plaintiff's most recent appeal. Admin.Rec. at 000093, 000087. The letters continued to cite incorrect policy language by including the 24 month "any occupation" language it had previously removed from its April 22, 2005 revised denial. <u>Id</u>.

In a SOAP Note dated September 13, 2005, the claims representative addressing Plaintiff's appeal noted that errors regarding policy language had been made in the past: "of note, the correct policy wording is that of Officers, Consultants, and it does appear this was misquoted in a prior letter, and will be corrected." Admin.Rec. at 000425.

In its last denial letter of September 13, 2005, Prudential relied on the opinion of

Kelly Clark, M.D. There is no evidence in the record that Dr. Clark has any expertise with TS. Dr. Clark did not examine Plaintiff. Dr. Clark opined that Plaintiff's midweek break was a "preference" and that Plaintiff should be referred to a headache specialist since headaches were "his chief symptom." Admin.Rec. at 000079. Dr. Clark concluded that while Plaintiff "was significantly impaired in the fall of 2001 due to medication side effects..." he no longer is impaired. Id.

Prudential also relied on the opinion of Martin S. Gizzi, M.D., Ph.D. whose specialty is neuro-opthalmology. Admin.Rec. at 000082. There is no indication that Dr. Gizzi has any expertise in TS. Dr. Gizzi did not examine Plaintiff. Dr. Gizzi writes that he "cannot identify any specific functional impairments ....[Plaintiff] opted to work part-time. Another option might be to find a less stressful position such as existed before 2000 with his current job, either with the same employer or with another employer." Admin.Rec. at 000084.

In its September 13, 2005 denial letter, Prudential stated:

> As of the claimed date of partial disability in October of 2001, Mr. Harrison did not have a decline in his functional capacity mainly due to a change of medication and a change of job stressors. The medical records support that once the medication was changed back, Mr. Harrison's decompensation increased. He also shortened his work week at this time, but based on the medical information available, this is not medically warranted from a neurological or psychiatric perspective. The decision to work a 4 day week appears to be a lifestyle change that Mr. Harrison has made, and not a medically necessary reduction.

Admin.Rec.. at 000071.

## DISCUSSION

Before reviewing Prudential's decision to terminate Plaintiff's benefits, the Court must determine what standard of review applies. In <u>Firestone Tire and Rubber Co., v. Bruch</u>, 489

U.S. 101, 115 (1989), the Supreme Court held that "a denial of benefits challenged under §

1132(a)(1)(B) is to be reviewed under a de novo standard, unless the benefit plan gives the

administrator or fiduciary discretionary authority to determine eligibility for benefits or to

construe the terms of the plan." When the plan confers such discretion, an "arbitrary and

capricious" standard of review applies. Smathers v. Multi-Tool Inc./Multi-Plastics, Inc.

Employee Health and Welfare Plan, 298 F.3d 191, 194 (3d Cir. 2002).

       The arbitrary and capricious standard requires that a court must not disturb a plan

administrator's interpretation of a plan as long as it is reasonable. Dewitt v. Penn-Del Directory

Corp., 106 F.3d 514, 520 (3d Cir. 1997). The Court must defer to the plan administrator unless

the administrator's decision was "without reason, unsupported by substantial evidence, or

erroneous as a matter of law." Pinto v. Reliance Standard Life Ins.Co., 214 F.3d 377, 393 (3d

Cir. 2000). However, such deference is not required if the decision is "clearly not supported by

the evidence in the record or the administrator has failed to comply with the procedures required

by the plan." Abnathya v. Hoffman-LaRoche, Inc., 2 F.3d 40, 41 (3d Cir. 1993).

       In the case sub judice, the Plan confers on Prudential the "sole discretion to

interpret the terms of the Group Contract, to make factual findings, and to determine eligibility

for benefits." Admin. Rec. at 00035. In light of the broad authority granted Prudential to interpret

terms and eligibility for benefits, the Court will review Prudential's decision to terminate

plaintiff's partial long-term benefits under the arbitrary and capricious standard, rather than under

a de novo standard.

       "[I]f a benefit plan gives discretion to an administrator or fiduciary who is

operating under a conflict of interest, that conflict must be weighed as a `factor in determining

whether there is an abuse of discretion.'" <u>Smathers</u>, 298 F.3d at 197 (quoting <u>Firestone</u>, 489 U.S. at 115. In the Third Circuit, where such a conflict of interest exists, courts adjust the arbitrary and capricious standard using a "sliding scale method, intensifying the degree of scrutiny to match the degree of conflict." <u>Pinto</u>, 214 F.3d at 379.

   The Third Circuit has outlined certain situations where a plan administrator may be operating under a conflict of interest. One example is where the insurer both funds and administers the welfare benefits plan. <u>Smathers</u>, 298 F.3d at 197. However, the Third Circuit in <u>Pinto</u> concluded that this arrangement by itself does not "typically constitute the kind of conflict of interest mentioned in <u>Firestone</u>...." <u>Pinto</u>, 214 F.3d at 383. In the case <u>sub judice</u>, there is no dispute that Prudential both administers and provides the funds to pay the benefits under the Plan.

   The degree of conflict increases where there is evidence of "procedural anomalies" in the Administrator's review of a claim. One example of such a procedural anomaly is when the insurance company reverses its initial decision to award benefits despite not receiving any new medical information. <u>Id.</u> <u>See also</u>, <u>Holzschuh v. UNUM Life Ins. Co.</u>, 2002 WL 1609983 at *6 (E.D.Pa. 2002). In the case <u>sub judice</u>, as will be discussed <u>infra</u>, Prudential reversed its initial decision to grant Plaintiff long-term benefits, despite not receiving any new medical information about Plaintiff. Indeed, Prudential began re-evaluating Plaintiff's benefits only two months after approving them.

   Another example of a procedural anomaly is when an insurance company relies on the opinions of its own non-treating physicians over the opinions of Plaintiff's treating physicians. <u>Cohen v. Standard Ins.Co</u>, 155 F.Supp.2d 346, 352-53 (E.D.Pa. 2001). In the case <u>sub judice</u>, as will

16

be discussed <u>infra</u>, Prudential relied on the opinions of its own non-treating physicians over the opinions of Plaintiff's treating physicians, all of whom had expertise in TS.

A conflict also exists and a "more searching scrutiny" is required where "the impartiality of the administrator is called into question." <u>Goldstein v. Johnson & Johnson</u>, 251 F.3d 433, 435 (3d Cir. 2001). This potential for prejudice can arise either because "the structure of the plan itself inherently creates a conflict of interest, or because the beneficiary has put forth specific evidence of bias or bad faith in his or her particular case." <u>Id.</u> at 435-36.

Plaintiff has put forth numerous instances where Prudential misstated policy provisions and created policy language which Plaintiff contends evidences bias or bad faith on the part of Prudential.  For example, even though Prudential knew that Plaintiff worked as a "Principal" for Milliman, in its initial denial letter of July 28, 2003, Prudential incorrectly cited the definition of disability applicable to employees of Milliman who were not "Officers, Principals and Consultants." Admin.Rec. at 000311.  In its March 1, 2004 denying Plaintiff's appeal, Prudential once again misquotes the wrong definitions, using the ones applicable to employees other than "Officers, Principals and Consultants" Admin.Rec. at 000264-265, even though its clear from the SOAP Note of July 26, 2003, that by this time Prudential knew that the definitions governing principals applied to Plaintiff ("40 hour work week does not apply to this policy...."). Admin.Rec. at 000396. Even in its October 15, 2004 letter in which it approved Plaintiff's request for long-term benefits, Prudential cited the definition of disability applicable to employees other than "Officer, Principals and Consultants." Admin. Rec. at 000219.

In its November 10, 2004 letter in which it discussed the disability benefits due to Plaintiff, Prudential misquoted policy provisions by stating that "beyond 24 months of disability

payments, if your monthly disability earnings exceed 60% of your indexed monthly earnings, Prudential will stop sending you payments and your claim will end." Admin.Rec. at 000213. The 60% language does not appear anywhere in the Plan or in the Rider. On the contrary, the only relevant measure that appears in the Plan is 80% of indexed monthly earnings. Admin. Rec. at 000041.

In its letter of December 23, 2004 Prudential informed Plaintiff that his benefits would be terminated shortly due to a 24-month "mental, psychoneurotic, or personality disorder." Admin.Rec. at 000189-90. No such language appears in the Rider for officers, principals and consultants, which applied to Plaintiff. Id. In fact this language does not appear in any policy provisions relating to any Milliman employees. Admin. Rec. at 00018, 00040. Prudential also misquoted the relevant policy language in its denial letter of March 31, 2005.  Admin.Rec. at 000126-127.

Prudential argues that its misquotations of policy language are harmless error and that it resulted from the fact that a number of different claims representatives worked on the file. Had Prudential misquoted policy provisions on one or two occasions, perhaps it could justify its error as harmless. However not only did Prudential misquote policy provisions on numerous occasions, it also on several occasions quoted policy provisions that did not even exist. In the best light such conduct indicates sloppiness on the part of Prudential in considering Plaintiff's claim for benefits. In the worst light, such conduct indicates a conscious attempt on the part of Prudential to manufacture a reason for denying Plaintiff benefits.

In short,  the Court finds that the procedural anomalies committed by Prudential, along with the misquotations and fabrication of policy language coupled with the fact that Prudential

18

was acting in the dual role of funding and administering the Plan, requires that the Court review Prudential's decision to terminate Plaintiff's benefits at the far end of the heightened arbitrary and capricious standard  and with a "high degree of skepticism." Pinto, 214 F.3d at 395.

Applying the far end of the heightened arbitrary and capricious standard, the Court finds the decision to terminate Plaintiff's partial long-term benefits is not supported by substantial evidence. In terminating Plaintiff's benefits, Prudential did not rely on any new medical information from doctors who examined Plaintiff after his benefits were terminated which indicated that Plaintiff's condition had improved. In its motion for summary judgment, Prudential states that "[t]he information from Dr. Meyer was the crux of the termination." Def. Brief at 23. Specifically, Prudential seizes on one piece of information Dr. Meyer relayed to Dr. Gerson during their phone call in which Dr. Meyer "indicated that Harrison was working 40-48 hours regularly and that the need for Wednesdays off was intangible." Id. However, the specific language Dr. Gerson attributed to Dr. Meyer is as follows:

> I raised the question to Dr. Meyer if this work pattern is a preference or an absolute requirement for him to do his job and Dr. Meyers [sic] states that he can't prove it or validate it but he feels in some intangible way this is medically necessary for the patient to maintain his equilibrium to work his 40 to 48 hour workweek and that this procedure somehow allows him a sense of balance that enables the patient to maintain an equilibrium in his life.

Admin. Rec. at 000156. (emphasis added).

Thus, Dr. Meyer did not merely opine hat he believed the four-day work week helped Plaintiff in some "intangible" way, but also opined that the four-day work week was "medically necessary." To the extent Prudential based its decision to terminate benefits on the fact that Dr. Meyer relayed to Dr. Gerson  that Plaintiff works a 40-48 work week and the typical work week for

19

a consulting actuary at Milliman is 37.5 hours,  Prudential itself admits in its brief that Dr. Meyer

was referring  to the fact that Plaintiff worked a 40 to 48 hour workweek <u>within the four day period</u>.

Def. Brief at 22.

Ironically, Prudential previously relied in part on Dr. Meyer's two reports in deciding

to grant Plaintiff benefits in October of 2004. Dr. Meyer had not issued any new reports since that

time. There is simply nothing new in the phone conversation between Dr. Gerson and Dr. Meyer that

would contradict Dr. Meyer's medical reports or that would suggest an improvement in Plaintiff's

medical condition since Prudential granted Plaintiff's request for long-term benefits in Ocotber of

2004. All Dr. Meyer did during the phone call was explain his earlier opinions.  If Prudential  had

any doubt as to any the conclusions of Dr. Meyer, it could have had Plaintiff examined by Dr. Gerson

at any time. Prudential  chose not to do so. On the contrary, all Dr. Gerson did was review Plaintiff's

medical records and speak to Dr. Meyer by phone.

The Court finds that in terminating Plaintiff's long-term benefits, Prudential did not

rely on any new medical information All the information relied on by Drs. Gerson, Clark and Gizzi

was the same information Prudential relied on in deciding to award Plaintiff long-term benefits in

October of 2004. There was simply no new medical information before Prudential after it initially

awarded Plaintiff long-term benefits.[2] The record  reveals that in terminating Plaintiff's long-term

---

[2] In its September 15, 2005 letter denying Plaintiff's appeal of its decision to terminate
Plaintiff's benefits and throughout its brief in support of its motion for summary judgment,
Prudential claims it terminated Plaintiff's benefits because Plaintiff's condition deteriorated in
October of 2001 when he started taking Geodon and that his "decompensation" increased as soon
as he was taken off of Geodon. In the first instance, Prudential already rejected this theory when
it awarded Plaintiff long-term benefits in 2004. In the second instance, Dr. Meyer wrote to
Prudential in July of 2003, some 21 months after Plaintiff's episode with Geodon, that Plaintiff's
condition had <u>not</u> improved, is no longer likely to improve and that it was "medically essential"
that Plaintiff work only four days a week. Admin. Rec. at 000316-319. In addition, in June of

benefits, Prudential relied, as it had one throughout the review of Plaintiff's claim, on the opinions of doctors (Gerson, Clark and Gizzi) who not only never examined Plaintiff but who were not specialists in TS.  In terminating Plaintiff's long-term benefits, Prudential in effect rejected the reports of Plaintiff's three TS specialists all of whom had examined Plaintiff and all of whom professionally opined based on what each personally observed that Plaintiff's four-day week was a medical necessity for Plaintiff to be able to manage the symptoms of his TS.

In sum, for the reasons stated above, the Court reviews Prudential's decision to terminate Plaintiff's long-term benefits under the far end of the heightened arbitrary and capricious standard. Applying that standard, the Court finds that Prudential acted arbitrarily and capriciously when  it terminated Plaintiff's long-term benefits and its decision is not supported by substantial evidence.

An appropriate Order follows:

---

2004, some 32 months after Plaintiff's episode with Geodon, Dr. Sacks wrote that Plaintiff still suffers from severe Tourette's and that the four day work week was a "needed compromise." Admin. Rec. at 000240.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GRAHAM A. HARRISON                     :
                                       :
            V.                         :        C.A. NO.  06-1380
                                       :
THE PRUDENTIAL INSURANCE               :
COMPANY OF AMERICA                     :


<u>ORDER</u>

     AND NOW, this 15th day of February, 2008, upon consideration of the parties' cross-motions for summary judgment, it is hereby ORDERED that

     The motion of the Defendant for summary judgment [Doc. #15] is DENIED.

     The motion of the Plaintiff for summary judgment [Doc. #14] is GRANTED.

     Judgment is ENTERED in favor of Plaintiff and against the Defendant.

     Plaintiff is entitled to long-term disability benefits under the terms of Defendant's Long Term Disability Insurance policy. Defendant is DIRECTED to resume paying long-term disability benefits to Plaintiff effective as of the date of this Order.

     Final Judgment is entered against the Defendant in an amount equal to the amount Plaintiff should have received from March 31, 2005 to the date of this Order, plus prejudgment interest thereon.

If the parties are unable to agree upon the amount of final judgment and the rate of prejudgment interest, the parties shall submit briefs on those issues by March 26, 2008.

The Clerk is DIRECTED to mark this case closed for statistical purposes.


BY THE COURT:


*/s/ THOMAS M. GOLDEN*
THOMAS M. GOLDEN, J.